MONIQUE C. WINKLER (Cal. Bar No. 213031)
SUSAN F. LAMARCA (Cal. Bar No. 215231)
  lamarcas@sec.gov
JENNIFER J. LEE (Cal. Bar No. 261399)
  leejen@sec.gov
DAVID ZHOU (NY Bar No. 4926523)
  zhoud@sec.gov
ANTHONY J. MORENO (Cal. Bar No. 219220)
  morenoa@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| DALE SWANBERG, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("the Commission" or "the SEC") alleges:

## SUMMARY OF THE ACTION

1.    This case involves financial reporting and accounting fraud at Granite Construction, Incorporated ("Granite"), an infrastructure-construction company based in Watsonville, California.  Granite's largest civil engineering projects, which included the construction of highways, bridges, and mass transit centers, were organized together in a single group, the Heavy Civil Group, and overseen by Dale Swanberg, who served as the group leader and senior vice president from 2017 through October 2019.  In order to conceal the deteriorating

performance of his group, Swanberg engaged in a fraudulent scheme to improperly defer the recording of cost increases on his projects.

2.     Swanberg was promoted in or around January 2017 to turn around the performance of the group, which had struggled for years and become a focal point of investors and Wall Street analysts who followed Granite's stock.  Swanberg faced pressure from within Granite to improve the Heavy Civil Group's financial metrics and performance, specifically revenues which made up about a quarter of Granite's business.  However, Swanberg and the group encountered significant increases in the expected costs to complete on a number of projects, which would have the effect of decreasing the Heavy Civil Group's revenues and profit margin.

3.     Faced with these competing demands, Swanberg orchestrated a scheme to hide the deteriorating performance of his group's projects.  Granite's policies and procedures and internal accounting controls required the construction teams within the Heavy Civil Group to put together a forecast for each project at the end of each quarter that was supposed to accurately estimate the total cost upon completion of construction (referred to herein as the "total expected cost").  The total expected costs were then plugged into Granite's general ledger that calculated both the revenues and the profit margins of the Heavy Civil Group's projects.

4.     In some cases, Swanberg manipulated his group's financials by directing his subordinates to use specific, rosier profit margin numbers, regardless of whether those numbers were justified based on the project team's estimate of the total expected costs.  He was, in essence, providing the answer to the math problem, and leaving his subordinates to work backwards to manufacture lower total expected cost numbers that would return Swanberg's desired profit margin.  In other cases, Swanberg directed his subordinates to defer recording certain increases to the total expected costs, which had the effect of overstating revenues and profit margins.

5.     Swanberg's scheme began to unravel in mid-2019.  Because several projects neared completion, his group could no longer defer recognition of the cost increases, which in turn led to substantial drops in the group's profit margins in the second and third quarters of

2019. Ultimately, Granite restated its financial statements included in its previously filed Forms 10-K for 2017 and 2018, and its Forms 10-Q for 2018 and 2019. In particular, Granite materially overstated its revenue by approximately $62 million over several quarters of 2017 and 2018, and materially understated its revenue in other quarters of 2018 and 2019. After Swanberg's scheme was publicly disclosed, the price of Granite's stock cratered. From October 2019 to March 2020, Granite stock price declined from a high of almost $35 per share to a low of approximately $12 per share.

6.      By his actions, Swanberg violated the antifraud provisions of the federal securities laws. Specifically, Swanberg violated 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; and Rule 13b2-1 [17 C.F.R. § 240.13b2-1]. Swanberg also aided-and-abetted Granite's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and Sections 13(a), and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a), and 78m(b)(2)(A)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

7.      The Commission requests, among other things, that the Court: (i) permanently enjoin Swanberg from further violating the federal securities laws as alleged in this complaint; (ii) order Swanberg to pay disgorgement with prejudgment interest; (iii) order Swanberg to pay civil monetary penalties; and (iv) prohibit Swanberg from acting as an officer or director of a publicly-traded company.

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.     Swanberg, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

11.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District.  Granite is based in this District and filed its incorrect financial statements from its headquarters.  The relevant offers and sales of securities also took place in this District.

12.     Under Civil Local Rule 3-2(e), this civil action should be assigned to the San Jose Division because a substantial part of the events or omissions that give rise to the claims alleged herein occurred in Santa Cruz County, where Granite's principal place of business was located.

## DEFENDANT

13.     **Dale Swanberg** is 59 years old and resides in Manhattan, Illinois.  From in or around January 2017 through October 2019, Swanberg served at Granite as a senior vice president and group manager who oversaw the company's largest civil engineering projects, which represented about a quarter of the company's reported revenues.

## RELATED ENTITY

14.     **Granite Construction Incorporated** is a Delaware corporation headquartered in Watsonville, California.  Granite's common stock is registered with the Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 and is traded on the New York Stock Exchange under the symbol "GVA."  Granite files and furnishes periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

## FACTUAL ALLEGATIONS

I.     **The Struggles of Granite's Heavy Civil Group**

15.     Granite, which was founded in 1922 and has been publicly traded since 1990, is a national infrastructure construction company that offers general contractor and construction

management services, and also produces and sells construction materials. Granite's construction projects include public and private highways, bridges, roads, tunnels, and airports.

16.     Through at least 2019, the company's largest projects were grouped together within the Large Projects Group, which was renamed the Heavy Civil Group in 2018. The group was an important subdivision for Granite, making up approximately one quarter of the company's reported revenues from 2017 through 2019. Thus, the performance of the Heavy Civil Group had a significant impact on Granite's revenues and profit margin. A recorded increase in the total expected costs of the Heavy Civil Group's projects decreased the revenues and profit margins of both the group, and the company as a whole.

17.     For years, the Heavy Civil Group had struggled to manage costs on its projects and improve its profit margin, and it had attracted the scrutiny of investors and analysts. At the end of the first quarter of 2017, Granite's senior management explained during a call with Wall Street analysts that the Heavy Civil Group's "results will steadily improve" in the next two years because a number of older, poorly performing projects would be completed in 2018. During the same call, Granite's senior management also announced that Swanberg had been promoted to lead the Heavy Civil Group and that, as "a seasoned veteran in the industry, who has led successful large project businesses in the past," Swanberg was "focused on returning this business back to its appropriate mid-teens gross [profit] margin levels." By the end of 2017, Granite's senior management told the market in press releases and conference calls that the Heavy Civil Group, which was shifting its focus to new, smaller projects, would improve its profit margins by the end of 2018.

## II.     Determining and Accounting for Total Expected Costs

18.     Granite was required to prepare financial statements in conformity with generally accepted accounting principles ("GAAP"), and stated in its annual reports filed with the Commission on SEC Form 10-K that its financial statements were in fact prepared in conformity with GAAP.

19.     Granite derived its revenue from construction contracts that can span several quarters or years.  Granite recognized the total revenue over time using what is known as a "percentage of completion" method that is based on costs.

20.     As disclosed by Granite in its critical accounting policies, the percentage of completion is calculated by taking the actual costs incurred to date and dividing by the total expected costs when the project is finished.  The actual costs are an objective number measuring all incurred project expenses, including but not limited to submitted bills and invoices.  The total expected costs are required to be calculated based on accurate estimates made by construction personnel based on their operational expertise and judgment, using historical cost and construction data, in accordance with Granite's prescribed process.

21.     The project's revenue recognized each period is then determined by multiplying the total contract amount and the percentage of completion.  As a result, a lower estimation of the total expected costs to complete a project would result in a higher percentage completion ratio and thus an overstatement of recognized revenues.

22.     Granite's policies and procedures and internal accounting controls required the project teams in the Heavy Civil Group to prepare a quarterly project forecast that included an estimate of the total expected costs.  To determine the total expected costs, project teams were required to perform a detailed bottom-up analysis of all the costs and make accurate estimates about the quantities and values of each cost line item.  In its Forms 10-K for fiscal years 2017 and 2018, Granite disclosed the following policy regarding the accounting for its construction projects:

> The accuracy of our revenue and profit recognition in a given period depends on the accuracy of our estimates of the cost to complete each project.  Cost estimates for all of our significant projects use a detailed "bottom up" approach, and we believe our experience allows us to create materially reliable estimates.

23.     Swanberg, as head of the Heavy Civil Group, had ultimate control over the group's forecasts.  The project teams that prepared the initial drafts of the forecasts reported to Swanberg, and he reviewed their drafts and worked directly with them on the forecast numbers. He had final approval authority over forecasts and exclusively determined adjustments to the

total expected costs before submitting to corporate accounting.  Because estimating the total expected costs required both construction expertise and knowledge of on-the-ground operations of the projects, Granite's corporate accounting and finance personnel had no insight into how Swanberg arrived at the estimates and no basis for assessing their accuracy.

24.    After Swanberg signed off, the forecasts were sent to Granite's corporate accounting personnel, who recorded the forecast numbers into the general ledger that calculated the reported revenues and profit margins.  Because the inputs into the general ledger required no additional review from Granite's corporate accounting personnel, the reported revenues of the Heavy Civil Group each quarter were accurate only if Swanberg and his teams reported accurate figures in their forecasts.

25.    In addition, Granite's policies and procedures and internal accounting controls required Swanberg to perform the final review of project forecasts each quarter and sign a certification that attested to the accuracy of the project forecasts.  The certification expressly represented that all items on his group's income statement, including revenue, had been "properly recorded on the books of Granite . . . in the proper accounting period," and that "[t]here are no significant changes to . . . forecasts or any other financial issues known to me as of the date of signing this certification that have not been reflected in the books of" Granite.  Furthermore, Swanberg had to certify that "[t]here have been no intentionally false and misleading statements, entries or omissions made in connection with my activities or the activities of my business unit."

26.    At all relevant times, Swanberg reviewed and approved the quarterly project forecasts of the Heavy Civil Group.  Swanberg also signed certifications each quarter attesting to the accuracy of those forecasts.  Swanberg knew, or was reckless in not knowing, that his sub-certification of the accuracy of the Heavy Civil Group's numbers would result in the dissemination to investors of that financial information.  The sub-certification itself made clear, just above the signature line, that Granite's senior executives would rely on the sub-certification "in connection with their certifications to the SEC pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002," which are a required part of Granite's publicly-filed financials.

Granite's senior executives did in fact rely on Swanberg's certifications in signing Granite's quarterly and year-end filings with the SEC.

**III.    Swanberg Engaged in a Fraudulent Scheme to Manipulate and Improperly Defer Total Expected Costs to Improve Revenues and Profit Margins**

27.    While head of the Heavy Civil Group, Swanberg attended trainings and received company documents explaining how to properly estimate expected costs and prepare project forecasts.  During 2017, Swanberg received a copy of Granite's standard operating procedure for cost forecasting, which explained that "under the percentage of completion method of contract accounting, the bottom line forecast numbers drive the calculation of recognized revenue.  For these reasons, it is required that the project forecasts be timely and accurate."

28.    These principles were reiterated in trainings that Swanberg attended, including one conducted by Granite's corporate controller in or around December 2018 that emphasized that it was important to adhere to Granite's forecasting principles to "[p]revent restatement of financial statements and potential clawbacks" because forecasts were used for "[r]ecognition of revenue in accordance with US GAAP."

29.    Despite this, at Swanberg's direction and with his ultimate approval, his subordinates in the Heavy Civil Group improperly manipulated profit margins and deferred the total expected costs of numerous projects in the group.  This misconduct caused Granite to materially misstate its revenues and profit margins for the period from 2017 through the third quarter of 2019.  The projects described below exemplify Swanberg's efforts to fraudulently dictate the reported costs and revenues, contrary to these accounting principles.

**A.    New York City Bridge Project**

30.    Between 2018 and 2019, Swanberg directed his subordinates to produce incorrect forecasts that resulted in specific, inflated profit margins for a bridge-construction project in New York City (the "New York City Bridge"), even when those margins were not defensible in the face of rising costs.

31.    The New York City Bridge was one of the newer projects undertaken by the Heavy Civil Group that Granite's senior management claimed in conference calls with analysts

would avoid the cost overruns that plagued older projects in the group.  As a result, Swanberg faced pressure from within Granite to keep control of the project's costs and ensure that the project was performing well.  However, by the end of 2018, the project team had concluded that the total expected costs were going to increase dramatically from prior estimates.  In or around January 2019, Swanberg acknowledged in emails and in-person meetings that the project team believed the total expected cost should be increased by approximately $35 to $40 million in the project's forecast for the fourth quarter of 2018.  Such an increase would have turned the project into a loss, with a negative profit margin of around $12 million.

32.     Nonetheless, Swanberg directed his subordinates to only reduce profit margin from the third quarter of 2018 by approximately $7.5 million, which resulted in a positive profit margin of around $28 million for the fourth quarter of 2018.  Soon thereafter, in or around January 2019, Swanberg held an in-person meeting with the project team with the stated goal of "trying to not revise the forecast for Q4."  Typically, the forecasted profit margin is supposed to be the result of a calculation involving the toFtal expected costs.  Swanberg, however, dictated what the profit margin would be, and his subordinates had to then backfill the forecasted numbers so they would add up to that predetermined margin.  To achieve Swanberg's desired margin, the total expected costs were increased by only about $4 million—a far cry from the $35 to $40 million cost increase recommended by the project team.

33.     During that January 2019 meeting, Swanberg and the project team reviewed the two contradictory versions of the cost reports maintained for the project.  One version kept track of the team's true and accurate estimates of the total expected cost, while the other version contained the fraudulent, significantly lower total expected cost numbers that were reported in the quarterly forecasts certified by Swanberg and used to prepare Granite's publicly reported financials.  After the meeting, a team member emailed Swanberg copies of both versions of the cost reports.

34.     The forecasting process followed a similar pattern in the first two quarters of 2019 as costs associated with the New York City Bridge continued to mount.  At the end of the first quarter of 2019, the project team told Swanberg that the profit margin should drop to around

negative $25.7 million, which the team deemed the "most likely" scenario and would have required about a $57.6 million freefall in margin from the previous quarter.  However, Swanberg again directed his subordinates to reduce the profit margin by only approximately $6.5 million. After the project team followed Swanberg's orders, the project forecast claimed a *positive* margin of approximately $25.1 million that far exceeded not just the team's "most likely" scenario, but even its "best possible" scenario, which would have reported a positive margin of only approximately $582,000.

35.     Yet again, the project team had to slash its total expected costs in order to arrive at the profit margin predetermined by Swanberg.  In the accurate version of the cost reports, the team recorded a total expected cost of approximately $313 million.  In sharp contrast, the fraudulent version that was reported to Granite's corporate accounting department only reflected a total expected cost of about $267 million.

36.     After the end of the second quarter, in or around July 2019, Swanberg directed the head of the project to decrease the profit margin down to approximately positive $5 million. By this point, the project team believed the margin should be about *negative* $24 million, but they nonetheless carried out Swanberg's instruction.  Project team members complained among themselves that they had to "fake" the cost numbers in order to hit Swanberg's desired positive $5 million margin.

### B.     Hudson River Bridge Project

37.     In another example, in connection with a bridge-construction project over the Hudson River in New York State (the "Hudson River Bridge"), the Heavy Civil Group's employees failed to perform the needed, detailed reviews of the expected future costs each quarter, as required by Granite's policies and procedures and internal accounting controls.

38.     The Hudson River Bridge project was a joint-venture partnership that involved two other construction companies in addition to Granite.  The joint-venture partnership prepared a forecast each quarter that was then shared with Granite.  Under Granite's policies and procedures and internal accounting controls, Granite's project team was required to perform a

detailed, "bottom up" review of the joint-venture's forecast and create Granite's own forecast for the project.

39.    Swanberg, however, became aware that his team was not performing the detailed review of project forecasts and in fact directed them on certain occasions to avoid performing the required review.  For instance, in or around March 2018, at the end of the first quarter, the Heavy Civil Group's controller informed Swanberg that the project team of the Hudson River Bridge project was not planning to perform a detailed review of the forecast even though such a review "will likely lead to a forecasted change to the [profit] margin."  The controller also informed Swanberg that if a first quarter forecast showed a significant increase in total expected costs so soon after the year-end Form 10-K filing, such an increase could raise questions about the year-end numbers.  Despite knowing that the project team was disregarding Granite's policies and procedures, Swanberg did not require his employees to perform such a review for the Hudson River Bridge project for the first quarter of 2018 and again in the first quarter of 2019 for similar timing reasons related to the prior fiscal year numbers.  At the same time, Swanberg repeatedly signed certifications vouching for the accuracy of the project forecasts.

40.    The inaccuracy of the total expected costs reported by Swanberg and the project team was exposed in the second quarter of 2019 when the actual costs of the still-ongoing project exceeded the total expected costs.  In other words, the actual costs had already surpassed Granite's purported estimate of the total costs upon completion.

41.    In mid-June 2019, Swanberg revealed to Granite's senior leadership that the project needed to reduce its profit margin by approximately $176 million as a result of cost increases.  Swanberg also disclosed that the joint-venture partnership running the Hudson River Bridge project had recognized most of the total expected cost increases back in the third quarter of 2018, which resulted in its total expected cost estimate being $239 million greater than Granite's estimate in the third quarter of 2018.

42.    Nonetheless, at the beginning of August 2019, Swanberg had a meeting with Granite's external auditor in which he represented that he regularly reviewed the joint venture's cost reports and attended joint venture partner meetings.  He told the external auditor that he kept

close track of the Hudson River Bridge project's financials and that he would have caught any significant errors in Granite's quarterly numbers for that project.

43.    Yet, Swanberg had approved total expected cost estimates for the Hudson River Bridge project in prior quarters that were so low that they were surpassed by the actual costs during the second quarter of 2019, and he permitted his employees to forgo detailed cost reviews even as the joint venture made clear several quarters earlier that the costs of completing the project were increasing substantially.  Swanberg's fraudulent actions allowed the project to report inflated revenues and profit margins in the third and fourth quarters of 2018, as well as the first quarter of 2019.

C.    **Swanberg Also Directed the Improper Deferral of Costs on Other Heavy Civil Group Projects**

44.    Swanberg directed his subordinates in the Heavy Civil Group to improperly delay or defer increases in the expected future costs of other projects, in order to reduce the impact to the group's revenues and profit margins.  For example, in connection with a dam-construction project in Texas, Swanberg directed his subordinates to spread a $3 million increase in total expected costs evenly across three quarters, as opposed to taking the increase in the quarter when the increased costs were forecasted by the project team.

45.    Indeed, over the course of his fraudulent scheme to improve the Heavy Civil Group's revenues and profit margins, Swanberg knew or was reckless in not knowing that the forecasts he reviewed, approved, and certified were inaccurate and did not adhere to Granite's policies and procedures or its internal accounting controls.  Nonetheless, he directed his subordinates to report specific, unsupportable profit margins, and to defer the recognition of certain cost increases.  He also did not disclose to other executives at Granite that the New York City Bridge project maintained two contradictory versions of the cost reports, or that his subordinate's estimates of total expected costs on various projects in the Heavy Civil Group differed dramatically from those estimates in the forecasts that he approved and sent to corporate.

IV.       **Swanberg's Compensation and Granite's Offerings**

46.     During the relevant time period, Swanberg received compensation, including bonuses, tied to his performance as the head of the Heavy Civil Group.

47.     At the same time, Granite conducted offers and sales of its securities.  For example, in or around June 2018, Granite offered its stock as consideration for over $500 million acquisition of a water infrastructure company.  Granite also sold stock to its employees via its Employee Stock Purchase Plan registered pursuant to a Form S-8.

V.        **Swanberg's Scheme Unraveled and Granite Restated Its Financials**

48.     Ultimately, Swanberg's scheme unraveled as several projects neared completion and the manipulated estimates of total expected costs were exposed by the much higher actual, incurred costs.  The group recognized the increases in total expected costs, which could no longer be manipulated or delayed.  After the Heavy Civil Group suffered significant reductions of its profit margins in the second and third quarters of 2019, Swanberg was terminated from his position.

49.     In or around January 2020, Granite management received internal complaints that questioned the accuracy of the project forecasts on one of the Heavy Civil Group's projects.

50.     Granite initiated an internal investigation that ultimately examined the significant projects within the Heavy Civil Group.  In or around February 2021, Granite filed its annual report on Form 10-K, which restated its previously reported financial statements for each quarter from the first quarter of 2018 through the third quarter of 2019, and also restated its year-end results for 2017 and 2018.

51.     Granite disclosed that its revenues had been overstated by approximately $31 million in 2017 and approximately $31 million 2018.  Because that revenue had been recognized too early, Granite's revenues in the first three quarters of 2019 were understated by approximately $62 million.

**FIRST CLAIM FOR RELIEF**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c))**

52.     The Commission realleges and incorporates by reference paragraphs 1 through 51.

53.     Swanberg, by engaging in the acts and conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter, employed devices, schemes, or artifices to defraud, and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

54.     By reason of the foregoing, Swanberg violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

**SECOND CLAIM FOR RELIEF**

**(Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder)**

55.     The Commission realleges and incorporates by reference paragraphs 1 through 51.

56.     By the conduct described above, Granite, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with scienter, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

57.     By engaging in the acts and conduct alleged above, Swanberg knowingly or recklessly provided substantial assistance to Granite, or to other persons employed by Granite, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and thereby aided and abetted such violations, and unless restrained and enjoined, will continue to violate these provisions.

**THIRD CLAIM FOR RELIEF**

**(Violations of Section 17(a) of the Securities Act)**

58.     The Commission realleges and incorporates by reference paragraphs 1 through 51.

59.     Swanberg, by engaging in the acts and conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means of instruments of transportation or communication in interstate commerce or by use of the mails,

      a.   With scienter, employed devices, schemes, or artifices to defraud;

      b.   Obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.   Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

60.     By reason of the foregoing, Swanberg violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**FOURTH CLAIM FOR RELIEF**

**(Violations of Rule 13b2-1)**

61.     The Commission realleges and incorporates by reference paragraphs 1 through 51.

62.     Swanberg, by engaging in the acts and conduct described above, directly or indirectly, falsified or caused to be falsified books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

63.     By reason of the foregoing, Swanberg violated, and unless restrained and enjoined will continue to violate Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

**FIFTH CLAIM FOR RELIEF**

**(Aiding and Abetting Violations Exchange Act Reporting Requirements)**

64.     The Commission realleges and incorporates by reference paragraphs 1 through 51.

65.     As an issuer of securities registered with the SEC, Granite was required to file with the SEC annual, quarterly, and current reports, in accordance with applicable rules and regulations, which included information as necessary to make the statements made in the reports, in the light of the circumstances under which they were made not misleading.  By the conduct described above, Granite failed to do so, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1, 13a-11, 13a-13, and 12b-20 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, 240.13a-13, and 240.12b-20].

66.     By engaging in the acts and conduct alleged above, Swanberg knowingly or recklessly provided substantial assistance to Granite, and to other persons employed by Granite, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1, 13a-11, 13a-13, and 12b-20 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, 240.13a-13, and 240.12b-20], and thereby aided and abetted such violations, and unless restrained and enjoined, will continue to violate these provisions.

**SIXTH CLAIM FOR RELIEF**

**(Aiding and Abetting Violations of Exchange Act Books and Records Requirement)**

67.     The Commission realleges and incorporates by reference paragraphs 1 through 51.

68.     As an issuer of securities registered with the SEC, Granite was required to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and disposition of the assets of Granite.  By the conduct described above, Granite failed to do so, in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

69.     By engaging in the acts and conduct alleged above, Swanberg knowingly or recklessly provided substantial assistance to Granite, and to other persons employed by Granite,

in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], and thereby aided and abetted such violations, and unless restrained and enjoined, will continue to violate this provision.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

I.

Enter an order permanently enjoining Swanberg from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Rule 13b2-1 [17 C.F.R. § 240.13b2-1], and from aiding-and-abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

II.

Enter an order requiring Swanberg to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon.

III.

Enter an order requiring Swanberg to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

IV.

Enter an order prohibiting Swanberg from serving as an officer or director of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the

1  Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. §

2  77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

3                                                    V.

4            Grant such other and further relief as this Court may determine to be just and necessary.

5

6  Dated: August 25, 2022                    Respectfully submitted,

7

                                             /s/  *Anthony J. Moreno*
8                                            Anthony J. Moreno
                                             Attorney for Plaintiff
9                                            SECURITIES AND EXCHANGE COMMISSION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                    18